Filed 7/24/13  P. v. Dennis CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B236745 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA115453) |
| v. | |
| KAMILAH LADELL DENNIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ricardo R. O'Campo, Judge.  Affirmed.

David D. Carico, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Kamilah Ladell Dennis appeals from the judgment entered following her conviction by jury of second degree murder (Pen. Code, § 187, subd. (a)) with personal use of a dangerous or deadly weapon (Pen. Code, 12022, subd. (b)(1)).  At the conclusion of a sanity trial, the court found that appellant was sane at the time of the offense.  The court sentenced appellant to prison for 16 years to life.  We affirm the judgment.

## FACTUAL SUMMARY

1. *Guilt Phase Evidence.*

   a. *People's Evidence.*

   Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established that about May 31, 2010, Shamida Ward (the decedent) brought appellant to Ward's Compton apartment to live.  Appellant was previously homeless.  Ward lived with her mother, Stephanie Sanders.  At some point, appellant and Ward fought in the apartment.  Sanders pushed appellant out of the apartment and told her to leave.

   Later, in June 2010 appellant assaulted Ward.  Sanders found appellant near the apartment complex, grabbed her, and the two fought.  Ward attempted to intervene and neighbors stopped the fight.  After June 2010 but before November 20, 2010, Sanders saw appellant at nearby locations, i.e., at a plaza, a park, and frequently at a shopping center.  Appellant never spoke to Sanders but looked at her in an intimidating way.  On one occasion, Sanders was ordering food at a restaurant and appellant rudely interrupted.  On another occasion Sanders and two of Ward's friends were in a laundromat and Sanders was conversing with one of them.  Appellant asked the other friend, "Isn't that that girl's mother?"  Sanders replied yes and left.  In November 2010, Sanders saw appellant reading a "voodoo" book and chanting near the complex.

   On November 20, 2010, appellant contacted Clarence Rogers in a parking lot in the above mentioned plaza, which was located at Compton and Wilmington in Compton.  Appellant later went to the 98 Cent Store (store), entered, and asked where hammers were.  Appellant went to the tool section and picked up a hammer.  She used it to hit

2

herself in the leg, as well as to hit shelves and the floor. Appellant took the hammer to the aisle containing kitchen items and began picking up knives. Appellant held two knives, then selected one that apparently had an eight-inch blade and took it to the register. The cashier told appellant the knife cost $1.10. Appellant paid for the knife with exact change. She also asked for a black bag. After the cashier told appellant the store provided only white bags, appellant accepted one. As appellant exited the store, she removed the knife from its package.

Rogers saw Sanders on the other side of the parking lot. After talking to a friend, Sanders began walking on Wilmington towards her apartment. En route, Sanders passed Ward and Ward gave apartment keys to her. After Rogers greeted Ward, Ward entered Jae's Market (market).

About three or four minutes later, Ward, carrying a pack of cigarettes, exited the market and walked towards Rogers's van. Appellant approached Ward and began stabbing at her. Ward tried to grab appellant's wrist, the two struggled, Ward fell, and appellant landed on top of her. Appellant stabbed Ward in the chest with the knife. Appellant pulled the knife out of Ward and stood. Ward rose and tried to flee, but appellant stabbed her in the chest again with the knife. Ward fled towards the market but collapsed, mortally wounded. Appellant took a few steps towards Ward but, after Ward collapsed, appellant walked towards the store. Appellant wiped the knife on her leg, placed the knife in the white bag, and walked away.

Ward died as a result of a stab wound to her left upper chest. That wound was about four inches deep. Ward also had a one-inch-deep wound in her back. Ward had two sharp force injuries on her right hand and five on her left hand. All seven were defensive wounds.

Los Angeles County Sheriff's Deputy Edgar Lopez went to the park to search for Ward's assailant. He saw appellant, who matched the assailant's description, sitting at a table in the park. Lopez exited his vehicle but did not draw his gun. Appellant spontaneously walked to Lopez's vehicle and placed her hands on its hood. Lopez

3

recovered from appellant's property a knife with blood on it. The knife was in a white bag.

b. *Defense Evidence.*

The parties stipulated Lopez "would testify that when he detained [appellant] in Tucker Park on the morning of November 20th, 2010, he asked [appellant] what happened, and [appellant] made the following statements to him: [¶] [Appellant] said that the girl doesn't let her breathe and that she bomb threatened [appellant]. [Appellant] stated that the girl and her mom somehow placed a bomb inside of her body, but it hadn't gone off, so that was why she stabbed her."

Pervilla Dennis (Pervilla), appellant's mother, testified as follows. At some point during appellant's adult life, appellant was temporarily committed to an institution because she was acting strangely. Appellant received mental health treatment at clinics. In 2009, Pervilla called the police because appellant tried to break windows in Pervilla's house. In 2010, appellant was sleeping at the park.

Ronette Goodwin-Mathews, a psychologist, evaluated appellant, interviewing her and reviewing various documents in the process. Goodwin-Mathews opined at trial that appellant was a paranoid schizophrenic. Based on appellant's records, it appeared the paranoid schizophrenia had been severe. A paranoid schizophrenic could experience hallucinations and delusions. Hallucinations could be auditory or visual. A delusion was a fixed belief not based on reality. Goodwin-Mathews reviewed medical records indicating appellant had discussed a delusion that she had been "drug raped" in 1999. Appellant had the bizarre delusion that Ward and Ward's mother controlled appellant's genital area.

Goodwin-Mathews testified a paranoid schizophrenic had delusions and hallucinations and would most likely act upon the hallucinations. Paranoid schizophrenia would affect a person's reasoning. If a person with paranoid schizophrenia believed the person was being harmed, the person would engage in acts of self-protection, and the illness would affect the person's perception of the immediacy of danger. Goodwin-Mathews opined a paranoid schizophrenic could intend to stab someone, and could intend

4

to kill someone based on delusions that the paranoid schizophrenic was being harmed. It was also possible for a paranoid schizophrenic to kill absent delusions.

Goodwin-Mathews testified she based her opinion in part on portions of appellant's statement to the detectives, and Goodwin-Mathews testified as to what those portions were. (We recite in part 1 of our Discussion Goodwin-Mathews's testimony relating those portions, and that recitation is incorporated by reference here.)

2. *Sanity Phase Evidence.*

The parties stipulated the court could consider the evidence presented at the guilt trial as evidence presented at the sanity trial. The parties also stipulated the court could consider as evidence at the sanity trial the prosecutor's copy of the transcript of appellant's statement to the detectives. Moreover, after the testimony discussed below, the recording (a CD) of said statement was admitted into evidence without objection. (We recite in part 1 of our Discussion pertinent contents of that statement, and that recitation is incorporated by reference here.)

In defense, Kaushal Sharma, a forensic psychiatrist, testified as follows. Sharma reviewed appellant's mental health records and interviewed appellant. Sharma opined appellant was a paranoid schizophrenic. Schizophrenia was a lifelong, persisting mental illness characterized by hallucinations, delusions, disorganized thought processes, and bizarre thinking. In the paranoid form of schizophrenia, the predominant symptom was suspiciousness, distrust, and false beliefs that bad or negative things were being done to the person.

As a result of appellant's serious mental illness, appellant may have had difficulty understanding the nature and quality of her act. She was unable to distinguish right from wrong. Sharma inferred from appellant's statement to the detectives that appellant believed her act was justified because of what the victim was doing to appellant. Sharma reviewed appellant's statements to the police. The statements reflected bizarre and irrational thinking. Appellant believed she was morally justified in committing the act.

5

During cross-examination, Sharma acknowledged that in his report he had stated appellant knew the nature and quality of her act based upon her going to the store to shop for a knife, preparing the knife, and then stabbing Ward.

Revenge for something in the past which was not an ongoing threat was not morally justified, and Sharma was reluctant to call a person who did such an act legally insane. Sharma would be inclined to call a person legally sane who engaged in revenge for past acts. If a person with mental illness believed someone was constantly trying to kill the person, or had put a spell on the person to try to kill the person, or was smoking drugs to create a boiling feeling to try to kill, the person would believe the person was morally justified in killing. Similarly, if a person with a mental illness believed someone's drug use was building a chemical inside a person and it was killing the person, or the person believed someone "heart-attacked" the person and made it so the person could barely breathe and was working with the devil and placed a spell and sickness on the person, the person would believe the person was morally justified in killing.

## *ISSUES*

Appellant claims (1) the trial court's exclusion during the guilt trial of evidence of appellant's statement to the detectives violated her due process right to present a defense, (2) the trial court erroneously refused during the guilt trial to instruct on imperfect self-defense, (3) the trial court committed prejudicial cumulative error during the guilt trial, (4) the trial court erroneously applied the *M'Naghten* test during the sanity trial, and (5) there was insufficient evidence at the sanity trial that appellant was sane.

## *DISCUSSION*

1. *The Trial Court Properly Excluded During the Guilt Trial Appellant's Statement to the Detectives.*

    a. *Pertinent Facts.*

        (1) *Appellant's Statement to the Detectives.*

Appellant made a recorded statement to Los Angeles County Sheriff's Detectives Martinez and Brossoit. The transcript (court's exhibit No. 3) of the statement is 46 pages.

6

Appellant made the statement at 5:04 p.m. on November 20, 2010. The transcript reflects appellant told the detectives the following.

Appellant was born in 1978. She completed the eleventh grade and obtained her GED. Appellant had been the victim of identity theft. In 1998 or 1999, appellant was drugged, raped, and beaten in the San Fernando Valley apartment where she lived with her mother. During that incident her assailants stuck her with needles. Appellant did not know who the assailants were.

Appellant moved to various places. Appellant said, "it's like when I went to those places it's like God led me to these people." Appellant said, "I felt as though God led me to them because he wanted them to be brought to justice because they did those things to me." God led appellant to the person who drug raped appellant. Appellant said, ". . . I'm tired of her. She, . . . identity – they not only drug raped me and beat me. [¶] . . . [¶] . . . And identity theft me . . . ." (*Sic*.)

Appellant had been acquainted with Ward since about February 2010. Ward was an escaped convict pretending to befriend appellant but Ward had been involved in the prior assault. In June 2010, Ward invited appellant to Ward's house. Appellant said, "they're trying to, . . . act as if they're friendly people in the community when these are actually wanted people. And I'm telling you they're wanted by me because the way that they're treating me as far as like trying to act like they're my friend." Appellant went to Ward's house and Ward invited appellant into Ward's room. Appellant sat on the bed in Ward's room. Ward took out a drug pipe and lit it. Appellant then had a horrible feeling in her vagina and felt some type of "chemical thing" was happening.

Appellant said that on the morning of November 20, 2010, she was outside a store and "when I sat there and anywhere that I am it's like a chemical from her drug use building up inside of me that somehow is making an explosive type of feeling . . . ." Appellant said, "She heart attacks me."

Appellant entered a store on Wilmington and Compton. Appellant bought a knife in the store. She bought the knife because "[Ward] threatens me and she'll walk past me and tell me that she used her drug on my body." Ward told appellant that the reason

7

Ward did it was Ward wanted to kill appellant.  Appellant told detectives, "You don't know me.  You . . . harass me in [1998] and you see me in [2010] and tell me this is another way that you're trying to harass me to kill me.  Why is this?"

Appellant bought the knife "because I planned to do that to her.  . . . because I'm tired of her."  Appellant planned to stab Ward.  Appellant was "tired of her telling me every time she walk pass me or every time I see her and her mom they always looking at me telling me that they put a spell on me.  This smell that they have that's trying to, you know, whatever it is that they trying to kill me with." (*Sic*.)  Appellant said they were trying to kill appellant "because they're wanted and they know they did this drug rape to me back then in [1999] and they haven't been caught for it and they been harassing me [ever] since." (*Sic*.)

After appellant exited the store with the knife, which was a steak or kitchen knife, appellant saw Ward walking towards appellant.  Appellant then grabbed Ward and stabbed her in the stomach with the knife.  Ward had been threatening appellant since 1999.  Appellant said to the detectives, ". . . you know why I did it?  Because . . . I barely can breathe.  I don't have an inside stomach because of her doing her drug use when I sat at her house." (*Sic*.)

A detective later asked appellant what appellant said when she encountered Ward on November 20, 2010.  Appellant replied, "I said -- What did I say?  I don't know what I said.  I said -- What did I tell her?  I said, . . . I told her she . . . messing with my breathing and she's trying to kill me. . . .  Why, I was like, why are you trying to kill me?"  When appellant said these things to Ward, Ward laughed but was not saying anything.  Appellant said to the detectives, "And then she noticed I had a knife and . . . [s]he was like, 'Call the police.'  I was like, 'Call 'em.  That's all I been trying to do ever since I notice that you threatened." (*Sic*.)

The following occurred:  "[Martinez]:  . . . today, when you met with . . . [Ward] . . . did she say anything to you other than laughing at you?  [¶]  [Appellant]:  She didn't laugh.  [¶]  [Martinez]:  Did she threaten you?  Did she try to hit you?  [¶]  [Appellant]:  Every time I see her she say something --  [¶]  [Martinez]:  Did she threaten you today?

8

[¶] [Appellant]: -- that she shouldn't say. [¶] [Martinez]: She threaten you? [¶] [Appellant]: Only reason why she didn't say anything to me today is -- ? Did she say something to me? Let me think about that. [¶] [Martinez]: Ok. [¶] [Appellant]: Did she say something to me? She always say, 'Bitch, . . . I'ma kill your daughter.' . . . She always say, 'Bitch, I take tokes on your body.' She always say, 'Bitch. Call the – I'm waiting for you to call the police.' " (*Sic*.) Ward also threatened appellant's son.

Appellant remembered sitting on top of Ward and stabbing her. Appellant said appellant grabbed her, threw her down, and put her knee in Ward's chest "because her and her friends jumped me in her hallway. How you 'gonna invite me to your house and then she, what she wanted me to do was realize that they are the people who threatened me." (*Sic*.)

Appellant was not mad on November 20, 2010; she was "fed up." Appellant denied she was in a rage and told the detectives, "I felt like I wanna get revenge for a person that was so damn guilty since [1999] that is carrying on in this world. [¶] . . . [¶] And they was, they was supposed to have been arrested a long time ago and they haven't."

The following occurred: [Martinez]: And you knew exactly what you were doing today when you stabbed her? [¶] [Appellant]: What do you mean? I wasn't out of it, just like right now I'm not out of my mind. [¶] [Martinez]: Yeah. So you weren't out of your mind? . . . [¶] [Appellant]: . . . Well actually when I walked up to the store, you know, I said I was gonna ask for a few dollars to buy me something to eat. Her momma and her friend walked past me and her momma always looks at me and gives me this look like they trying to kill you. 'Cause they told me that they would kill. They trying to kill me, period. So it's hard for me to just keep on letting somebody. I'm looking over my shoulder everywhere I am. And then, when I'm at someone's house, or my mom house, or friend's house, it's like they does this thing with a CD. . . . I could be sitting somewhere and it's like she does this thing that with her drug that it's like they said it's a bomb where I am. I don't know how it gets inside of my body but it does." (*Sic*.)

9

Appellant said, "It does like an explosion thing" and, when that happened, she hurt inside. This had been occurring for more than eight months.

After appellant stabbed Ward, appellant went to a park and sat. A detective asked why and appellant replied, "What do you mean why? Because I know there's a consequence for everything that you do but I wasn't gonna run or hide." Appellant also said, "These fools did all of this mess to me back in [1999] and then running and hiding and then send people to follow me around in my life and then coming so they harass me again. You know, I'm tired of that!" Appellant knew it was wrong to stab Ward.[1]

      (2) *Goodwin-Mathews's Testimony Relating Appellant's Statements to the Detectives.*

During the guilt phase, Goodwin-Mathews testified for the defense as follows. Goodwin-Mathews opined appellant was a paranoid schizophrenic. Goodwin-Mathews's opinion was based in part on appellant's recorded statement to the detectives.

During direct examination, appellant asked Goodwin-Mathews on what statements she based her opinion. Goodwin-Mathews testified, "Statements such as, I'm being bomb threatened. I have explosives in my genital and vaginal area, statements like that that don't make sense or are not based on some type of reality. [¶] When this person smokes a pipe, they're messing up my breathing. Each time they smoke a pipe, I have a burning sensation. I can smell it. Those are olfactory hallucinations."

---

[1]     The following occurred: "[Martinez]: Did you know it was wrong to stab her? [¶] [Appellant]: Well I know – everybody knows that you aren't supposed to do things like that. But she isn't supposed to do those -- [¶] [Martinez]: But do you know you're not supposed to do things like that? [¶] [Appellant]: She . . . wasn't supposed to hit [my son] in his head with a damn bat. [¶] [Martinez]: I know that. But did you know that -- ? [¶] [Appellant]: She wasn't supposed to. [¶] [Martinez]: Did you know that? [¶] [Appellant]: I know that! [¶] [Martinez]: You know that was wrong? [¶] [Appellant]: I know that. I know that. [¶] [Martinez]: Ok. [¶] [Appellant]: Of course I know that! My mind is all the way here when they said, . . . I'm tired of her telling me that she's doing these drugs. Uses the explosion things on me because she's trying to take me out of this world. [¶] [Martinez]: Wait. [¶] [Appellant]: And when I'm sitting amongst someone and she does those things to people they don't deserve that."

10

Appellant asked what about appellant's statement made Goodwin-Mathews think appellant was delusional. Goodwin-Mathews replied it was "[t]he theme that she's been drug raped and a bomb, sort of bomb has been placed in her genital area that has not exploded yet. But yet, she has this burning sensation feeling. [¶] The theme was that this person has been threatening her life and messing with her breathing." Goodwin-Mathews testified appellant told detectives that Ward had been doing that, and that Ward and Ward's mother "had been messing with [appellant's] breathing."

Goodwin-Mathews testified appellant "was under the delusion that in 1999, she was drugged and raped by this individual and their associates, and that they had returned several years later to continue to torment her." Appellant said that whenever Ward was using a pipe, appellant experienced a burning sensation in her lower body.

According to Goodwin-Mathews, severe paranoid schizophrenia could affect a person's thinking. Paranoid schizophrenia would affect a person's reasoning, how the person viewed danger and its immediacy, and what the person did to prevent the occurrence of the perceived danger.

During redirect examination, Goodwin-Mathews testified appellant told the detectives the following. Appellant believed Ward and Ward's mother were constantly trying to threaten and kill appellant. Ward and Ward's mother were trying to put a spell on appellant to kill appellant. Ward and her mother "would smoke drugs to make a boiling feeling in [appellant] to kill her" and "that was building up inside of [appellant] and about to go off, the bomb." Ward and her mother worked with the devil and put a sickness and spell on appellant.

(3) *Proceedings Pertaining to the Exclusion of Appellant's Statement.*

After Goodwin-Mathews testified, appellant proffered appellant's statement to the detectives. The court indicated it had read the transcript of the statement. Appellant argued, inter alia, as follows. The statement was nonhearsay circumstantial evidence of appellant's state of mind, i.e., that she believed that what she said in her statement was true. Appellant was not trying to prove someone placed a bomb in her, threatened her, attacked her, placed a spell on her, or anything similar, but was trying to prove appellant

11

believed these things. Appellant's state of mind was "relevant to premeditation and intent to kill." In the alternative, appellant's statement was hearsay admissible under the state of mind hearsay exception.

The court indicated, inter alia, as follows. About 99 percent of appellant's statement was hearsay that did not fall within the hearsay exception for existing mental or physical states (Evid. Code, §§ 1250, 1251). The court considered the time frame of appellant's statement, its context, and appellant's opportunity to fabricate. Appellant gave the statement about 5:00 p.m. on November 20, 2010, eight or nine hours after the incident. She gave the statement at the police station, after being *Mirandized*, and was well aware police were interviewing her. Appellant had an opportunity to fabricate and the statement was untrustworthy.

The court indicated a very small portion of appellant's statement might have been nonhearsay, such as appellant's statement she felt a burning sensation, but that particular statement could not be extracted from its context and admitted into evidence by itself. The court excluded appellant's entire statement under Evidence Code section 352.

The court also stated, "However, the relevant portions or what the court found relevant for that purpose was already testified to by . . . [Goodwin-Mathews]. And it was used for the basis of forming her opinion and whatever her opinion was for the purposes of the defense arguing that she was not able to form the intent to kill or her mental state that is required for murder."

During its final charge, the court told the jury that Goodwin-Mathews, in reaching her conclusions as an expert witness, considered, inter alia, appellant's statement to the detectives, the jury could consider that statement only to evaluate Goodwin-Mathews's expert opinion, and the jury could not consider that statement as proof of the truth of the information in the statement.

b. *Analysis.*

(1) *The Trial Court Properly Excluded During the Guilt Trial Appellant's Statement to the Detectives as Evidence of Her Delusions, i.e., Beliefs Not Based on Reality.*

Appellant claims the trial court's exclusion during the guilt trial of evidence of appellant's statement to the detectives violated her due process right to present a defense. In particular, appellant argues that specific statements, i.e., "that [Ward] had stolen [appellant's] identity, 'drug raped' and beaten her, placed spells on her that affected her heart and breathing, threatened her and her family, and planted a bomb or 'explosion things' in [appellant] in order to kill her" were nonhearsay circumstantial evidence of appellant's delusions. She argues this evidence was relevant (1) to prove appellant was provoked by a subjective heat of passion that negated premeditation and deliberation, (2) to negate express and implied malice, and (3) to prove appellant's "state of mind and conduct in conformity" therewith, i.e., to show imperfect self-defense.

(a) *There Is No Need to Consider Appellant's Claim as It Relates to the Issues of Premeditation and Deliberation.*

To the extent appellant's claim relates to premeditation and deliberation, there is no need to consider the claim because the jury convicted appellant of second degree murder. No prejudicial error occurred with respect to the issues of premeditation and deliberation.

(b) *The Trial Court Properly Excluded Appellant's Statement to the Extent It Pertained to the Issues of Express and Implied Malice.*

To the extent appellant's claim relates to express and implied malice, we note neither party discusses the fact appellant proffered her entire statement (the transcript of which consisted of 46 pages), not merely the specific delusional statements about which she argues here. Nonetheless, we reject appellant's claim for the reasons discussed below.

13

The trial court excluded appellant's statement under, inter alia, Evidence Code section 352. We review the court's ruling under familiar principles[2] and review it, like rulings on all admissibility issues, for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717, 723.)

The court, ruling on the admissibility of appellant's statement to the detectives, indicated Goodwin-Mathews already had testified to relevant portions of that statement as nonhearsay bases for Goodwin-Mathews's *expert opinion* testimony that appellant suffered from a *specified* mental illness, i.e., paranoid schizophrenia. Goodwin-Mathews testified to the effect delusions and hallucinations were consequences of appellant's mental illness. Goodwin-Mathews's opinion, according to the trial court, was admissible to negate appellant's ability to formulate express or implied malice.

The trial court reasonably could have concluded that the introduction into evidence of the specific delusional statements would have been cumulative on the issue of express or implied malice, would have involved unnecessary consumption of time, and would have risked confusing the jury into erroneously thinking appellant's sanity was at issue at the jury trial. Moreover, appellant proffered her entire statement, which would have presented information other than that contained in the specific delusional statements, and the introduction of the entire statement similarly would have involved unnecessary consumption of time and would have risked confusing the jury. To the extent appellant's claim relates to express or implied malice, the trial court properly excluded the specific delusional statements under Evidence Code section 352. The application of ordinary rules of evidence, as here, does not violate a defendant's right to due process. (Cf. *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.)

---

[2]   A trial court enjoys broad discretion under Evidence Code section 352 when assessing whether probative value outweighs undue prejudice, confusion, or consumption of time. (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1337.) When ruling on a section 352 motion, a trial court need not expressly weigh prejudice against probative value, or even expressly state it has done so. All that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under section 352. (*People v. Williams* (1997) 16 Cal.4th 153, 213.)

Finally, even if the trial court erred by excluding as hearsay and under Evidence Code section 352 the specific delusional statements, it does not follow we must reverse the judgment. If the trial court had admitted those portions, the prosecutor would have been entitled under Evidence Code section 356 to introduce into evidence other relevant portions of appellant's statement to the detectives. (*People v. Zapien* (1993) 4 Cal.4th 929, 959; *Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 850.)

Appellant's statement to the detectives contained information other than the specific delusional statements about which appellant now complains. In particular, appellant's statement, fairly construed, reflects appellant told the following to the detectives. Appellant felt God led her to Ward and Ward's mother because God wanted the two "brought to justice" for what they did to appellant. God led appellant to Ward, who was involved in the drugging and raping of appellant. Ward and Ward's mother were not only "wanted people" but they were "wanted by [appellant]" because of the way they were treating appellant.

Appellant planned to stab Ward because appellant was tired of her. Shortly before appellant stabbed Ward, each of them was encouraging the other to call the police; appellant was not then in imminent danger. Appellant wanted to "get revenge for a person that was so damn guilty since [1999] that is carrying on in this world." Appellant knew it was wrong to stab Ward. In short, if the specific delusional statements had been admitted into evidence, it is reasonably probable the People would have introduced into evidence other relevant portions demonstrating appellant intentionally killed Ward out of revenge. No prejudicial evidentiary error resulted from the trial court's exclusion of the specific delusional statements. (Cf. *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

(c) *The Trial Court Properly Excluded Appellant's Statement to the Extent It Pertained to the Issue of Whether Appellant Acted to Prevent Harm to Herself, or to the Issue of Imperfect Self-Defense.*

To the extent appellant claims the specific delusional statements of her statement were admissible to prove her "state of mind and conduct in conformity" therewith, i.e., to

prove imperfect self-defense, we note neither party discusses the fact appellant proffered her entire statement as "relevant to premeditation and intent to kill," and never argued her statement was admissible to prove she acted in imperfect self-defense. However, we reject appellant's claim for the reasons discussed below.

We note there was and is no real dispute as to what appellant's conduct was: she killed Ward by stabbing her. Evidence on that issue would have been properly excluded under Evidence Code section 352 as involving undue consumption of time.

As to whether appellant killed Ward intending to prevent harm to herself, appellant is really arguing (as revealed by her reply brief argument on the issue of prejudice arising from the instant alleged error) that the specific delusional statements were admissible on the issue of imperfect self-defense.

Under the doctrine of imperfect self-defense, an actual but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought with the result the offense is reduced to voluntary manslaughter. The defendant must fear immediate harm that must be dealt with instantly. (*People v. Rogers* (2006) 39 Cal.4th 826 (*Rogers*).) The defendant must also believe the use of deadly force was necessary. (*People v. Valencia* (2008) 43 Cal.4th 268, 288, fn. 6.) The doctrine requires that the defendant both possess and act upon the required state of mind. (*People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1016 (*Sinclair*).)

To the extent appellant argues the trial court erred by excluding the specific delusional statements as evidence of imperfect self-defense, we reject the argument, first, because "imperfect self-defense cannot be based on delusion alone. [Fn. omitted.]" (*People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1446 (*Mejia-Lenares*); *id*. at pp. 1444, 1461.)[3] It follows said portions were irrelevant and inadmissible as evidence of imperfect self-defense.

---

[3] The issue of whether the doctrine of imperfect self-defense applies when the defendant's actual but unreasonable belief in the need for self-defense is based solely on a psychotic delusion is pending before our Supreme Court in *People v. Elmore* (S188238).

16

Second, none of the specific delusional statements demonstrate appellant actually believed she was defending herself from imminent peril to life or great bodily injury from Ward.[4] Third, none of those statements demonstrate appellant believed it was necessary to defend herself from such imminent peril, much less use deadly force to do so. For each of those reasons, said statements were irrelevant and inadmissible on the issue of imperfect self-defense.

Finally, even if the trial court erred by excluding the specific delusional statements, it does not follow we must reverse the judgment. First, appellant's statement to the detectives, fairly read, indicates as follows. Appellant knew from February 2010 through November 20, 2010, that she had been acquainted with Ward and had been doing a host of things free from imminent peril to life or great bodily injury from Ward. For example, appellant went to Ward's house, entered it, and entered Ward's room. Appellant never told the detectives that Ward inflicted great bodily injury upon appellant after February 2010, when appellant first became acquainted with her, but before November 20, 2010.

On November 20, 2010, appellant went to the store on Wilmington and Compton. Apparently Ward was not with appellant at that time, and appellant was presumably free to call the police if she had been in danger. Appellant told the detectives that when appellant walked to the store, she had said that she had planned to ask for money to buy herself something to eat. Appellant did not tell detectives she was going to tell anyone that appellant was in fear of imminent great bodily injury or death. Appellant indicated that at one point she was outside the store; appellant did not tell the detectives that Ward was with her at that time.

---

[4]     Notwithstanding appellant's assertion to the contrary, appellant, in her statement to the detectives (as distinguished from her statement to Lopez), never said

Ward ". . . planted a bomb or 'explosion things' in [appellant] in order to kill her." Appellant vaguely said to the detectives, inter alia, "she does this thing that with her drug that *it's like they said* it's a bomb where I am. *I don't know how* it gets inside of my body but it does." (Italics added.)

17

Appellant later entered the store, moved freely through the store, bought a knife, and exited the store, all without Ward. At one point appellant told the detectives that when she later met with Ward, Ward said nothing to appellant. To that extent, Ward said nothing threatening. Appellant never told the detectives that Ward was armed or that Ward tried to strike appellant. Appellant also indicated that shortly before appellant stabbed Ward, each of them was encouraging the other to call the police; Ward was not then threatening appellant and appellant was not then in imminent danger from Ward. Appellant had been acquainted with Ward about nine months, but appellant's statement does not indicate Ward inflicted any great bodily injury upon appellant during that time.

In sum, even if the specific delusional statements had been admitted into evidence, it is reasonably probable the People would have introduced into evidence other relevant portions demonstrating (1) appellant did not actually believe she was defending herself from imminent peril to life or great bodily injury from Ward, (2) did not believe it was necessary to defend herself from such imminent peril or use deadly force to do so, and (3) as previously discussed, appellant murdered Ward out of revenge and therefore did not act upon the requisite state of mind for imperfect self-defense. (See *Sinclair, supra,* 64 Cal.App.4th at p. 1016; *People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1270.) No prejudicial evidentiary error occurred. (*Watson, supra*, 46 Cal.2d at p. 836.)

(2) *The Trial Court Properly Excluded During the Guilt Trial Appellant's Statement as Evidence of Her Hallucinations, i.e., Sensory Perceptions Not Based on Reality*.

Appellant claims the trial court's exclusion of other specific statements, i.e., her "statements to the detectives that she experienced the taste, odor, and physical sensation of burning and pain inside her when the victim's mother passed by her on the day of the homicide" violated appellant's due process right to present a defense. Appellant argues these statements reflecting appellant's hallucinations fell within the hearsay exception for statements of existing mental or physical states (see Evid. Code, §§ 1250, 1252) and were admissible circumstantial evidence that she "conducted herself in order to stop the odor,

18

burning, and pain from happening" and did not premeditate and deliberate when she bought the knife.

(a) *There Is No Need to Consider Appellant's Claim as It Relates to the Issues of Premeditation and Deliberation.*

To the extent appellant's claim relates to premeditation and deliberation, there is no need to consider the claim because the jury convicted appellant of second degree murder.

(b) *The Trial Court Properly Excluded Appellant's Statement to the Extent It Pertained to the Issues of Express or Implied Malice.*

To the extent appellant's claim relates to express or implied malice, the specific hallucinatory statements to the detectives as to what she allegedly experienced earlier when Ward's mother passed by appellant were not statements of appellant's mental or physical state existing at the time she spoke with the detectives. Evidence Code section 1250 was therefore inapplicable.

The specific hallucinatory statements, if anything, were statements of appellant's prior mental or physical state governed by Evidence Code sections 1251 and 1252. However, section 1251 does not apply unless "[t]he declarant is unavailable as a witness." (Evid. Code, § 1251, subd. (a).) Evidence Code section 240, subdivision (a), defines the phrase " 'unavailable as a witness.' " Appellant elected not to testify. Where, as here, the declarant is a party, the party may not create his or her own unavailability for purposes of Evidence Code section 240, and thus section 1251, by invoking a right not to testify. (Cf. *People v. Elliot* (2005) 37 Cal.4th 453, 483; *People v. Edwards* (1991) 54 Cal.3d 787, 819 (*Edwards*).)

Even if appellant had been unavailable as a witness and the specific hallucinatory statements might otherwise have fallen within the hearsay exception for prior mental or physical states (Evid. Code, § 1251), the statements were inadmissible if they were "made under circumstances such as to indicate [their] lack of trustworthiness." (Evid. Code, § 1252.)

19

In the present case, appellant gave her statement to the detectives nine hours after she killed Ward. At one point Martinez asked appellant what she said to Ward when appellant encountered her on November 20, 2010. Appellant first said appellant did not know what appellant said. However, after indicating appellant was thinking, appellant told Martinez that appellant told Ward that Ward was messing with appellant's breathing and trying to kill appellant. Appellant told Martinez that after appellant said this, Ward said nothing. However, appellant then told Martinez that Ward saw the knife and said " 'Call the police.' " Later, after Martinez repeatedly asked appellant if Ward had threatened her, appellant replied, "Only reason [Ward] *didn't* say anything to me today is --? Did she say something to me? Let me think about that." (Italics added.) Appellant then claimed Ward said Ward was going to kill appellant's daughter.

The trial court did not abuse its discretion by excluding as inadmissible hearsay appellant's specific hallucinatory statements on the ground they lacked trustworthiness for purposes of Evidence Code section 1252. (Cf. *Edwards, supra*, 39 Cal.3d at pp. 819-820.)

Moreover, we earlier concluded the court's exclusion of appellant's specific delusional statements as evidence of express and implied malice was proper under Evidence Code section 352. Similar reasoning applies here to appellant's specific hallucinatory statements, and her conduct (stabbing) as such was not really at issue. The trial court did not abuse its discretion by excluding the evidence of appellant's specific hallucinatory statements, and the application of the ordinary rules of evidence, as here, does not violate a defendant's due process right to present a defense. Finally, any erroneous exclusion was not prejudicial given the previously discussed admissible evidence in her statements that she intentionally murdered Ward out of revenge. (*Watson, supra*, 46 Cal.2d at p. 836.)

(c) *The Trial Court Properly Excluded Appellant's Statement to the Extent It Pertained to the Issue of Whether Appellant Acted to Stop the Odor, Burning, and Pain, or to the Issue of Imperfect Self-Defense.*

Appellant never argued below that her specific hallucinatory statements were admissible to prove appellant "conducted herself in order to stop the odor, burning, and pain from happening" or were admissible on the issue of imperfect self-defense, but we conclude for the reasons below that the statements were inadmissible on those issues. First, appellant is really arguing that said statements were admissible on the issue of imperfect self-defense. *Mejia-Linares* stated in the context of a claim of instructional error, "As imperfect self-defense cannot be based on delusion alone, appellant was not entitled to have jurors instructed to consider evidence of hallucination on the issue of whether appellant killed in the actual but unreasonable belief in the need to defend against imminent peril." (*Mejia-Linares, supra*, 135 Cal.App.4th at p. 1461.) (See fn. 5, *ante*.) We reach a similar conclusion regarding appellant's current claim of evidentiary error; appellant's specific hallucinatory statements were irrelevant and inadmissible as evidence of imperfect self-defense.

Second, none of the specific hallucinatory statements demonstrate appellant actually believed she was defending herself from imminent peril to life or great bodily injury from Ward. Third, none of said statements demonstrate appellant believed it was necessary to defend herself from such imminent peril. For each of those reasons, said statements were irrelevant and inadmissible on the issue of imperfect self-defense.

Further, we earlier rejected appellant's claim as it relates to express or implied malice because the specific hallucinatory statements were untrustworthy inadmissible hearsay not made admissible by Evidence Code sections 1250, 1251, and/or 1252. That reasoning applies here. The trial court did not abuse its discretion by its evidentiary

21

ruling and the application of the ordinary rules of evidence, as here, does not violate a defendant's due process right to present a defense.[5]

Finally, even if the trial court erred by excluding the specific hallucinatory statements, no prejudicial error occurred for the same reasons no prejudicial error occurred by reason of the court's exclusion of the specific delusional statements. (Cf. *Watson, supra*, 46 Cal.2d at p. 836.)

2. *The Trial Court Properly Refused to Instruct During the Guilt Trial on Imperfect Self-Defense.*

a. *Pertinent Facts.*

After Goodwin-Mathews testified as a defense witness, appellant asked the court to instruct on imperfect self-defense based on (1) appellant's statements to Lopez, (2) Goodwin-Mathews's "testimony regarding delusion," and (3) Sanders's testimony "regarding prior incidents." Appellant also based her request on appellant's statements to Lopez as reflected in his stipulated testimony, including her statements to Lopez that Ward and her mother had placed a bomb inside appellant, it had not gone off, and that is why appellant stabbed Ward.

The trial court indicated there had to be evidence of the elements of imperfect self-defense. The court later stated, "The court doesn't find that [those elements are present], because her particular statement that the defense is relying on is that there was a bomb inside her, but it hadn't gone off, so that is why she stabbed her. But there is no imminent danger." The court also stated, ". . . something [was] done to her, and she is almost revengeful of that act. And that is why she commits the stabbing. It doesn't say that she stabbed a person to prevent someone from detonating it. In fact, the remedy, if

---

[5]     Appellant asserts, "The remainder of the interview contained party admissions concerning the killing which the prosecution could have introduced into evidence had it been so inclined." The prosecutor did not proffer them. Insofar as *appellant* proffered them, they were inadmissible hearsay to which the Evidence Code section 1220 hearsay exception for admissions was inapplicable.

someone puts a bomb in you, not to kill the person that put the bomb in you; that would be almost a revenge conduct, but it will have the bomb removed." (*Sic*.)

      b. *Analysis.*

      Appellant claims the trial court erred during the guilt trial by refusing to instruct on imperfect self-defense. Appellant argues, inter alia, "There was substantial evidence supporting a finding that [appellant] feared great bodily harm, albeit based on a delusion and hallucinations." We reject appellant's claim.

      First, as previously discussed, imperfect self-defense cannot be based on delusions or hallucinations alone. (*Mejia-Lenares, supra,* 135 Cal.App.4th 1437, 1444, 1446, 1461; see fn. 5, *ante*.)

      Second, even if imperfect self-defense could be based on delusions and/or hallucinations alone, we note the following. As for appellant's statements to Lopez, appellant told him "the girl doesn't let her breathe." Appellant was obviously breathing, the statement was vague, and it appeared to be nothing more than hyperbole indicating "the girl" (assuming this was Ward) was domineering. Lopez's stipulated testimony did not reflect appellant told Lopez when Ward made the alleged bomb threat, whether Ward stated the threat to appellant, how much time passed from the time of the threat to the time appellant killed Ward, that the threat caused appellant to believe it was necessary to defend herself from imminent peril to life or great bodily injury, or that, acting on that belief, appellant stabbed Ward.

      According to Lopez, "[Appellant] stated that the girl and her mom somehow placed a bomb inside of her body, but it hadn't gone off, so that was why she stabbed her." Again, however, Lopez's stipulated testimony did not reflect that appellant told Lopez when Ward put the bomb in appellant's body, how much time passed from the time Ward put the bomb in appellant to the time appellant killed Ward, or why the bomb had not detonated. Nor did that testimony reflect whether appellant believed Ward had any control over detonating the bomb. If appellant did not believe Ward controlled its detonation, appellant killed Ward, not believing it was necessary to defend herself from imminent peril to life or great bodily injury coming from Ward, but in revenge for

23

Ward's past act of putting the bomb in appellant. Nor did Lopez's stipulated testimony reflect appellant said she acted on a belief it was necessary to defend herself from imminent peril to life or great bodily injury.

As for Goodwin-Mathews's testimony, the trial court, when ruling on the admissibility of appellant's statements to the detectives, stated, "relevant portions or what the court found relevant for that purpose was already testified to by . . . [Goodwin-Mathews]. And it was *used for the basis of forming her opinion* and whatever her opinion was for the purposes of the defense arguing that *she was not able to form the intent to kill or her mental state that is required for murder*." (Italics added.) Thus, Goodwin-Mathews's "*testimony* regarding delusion" (italics added) was not admitted on the issue of imperfect self-defense (i.e., voluntary manslaughter). Even if appellant, referring to Goodwin-Mathews's "testimony regarding delusion," was referring to Goodwin-Mathews's testimony concerning appellant's *statements* to detectives, those statements were not admitted for their truth on any issue but as a nonhearsay basis for Goodwin-Mathews's expert opinion testimony, as the court so instructed the jury during the final charge.[6]

We have recited in our Factual Summary the testimony from Sanders that appellant apparently refers to as Sanders's testimony "regarding prior incidents." We conclude appellant's statements to Lopez, Goodwin-Mathews's "testimony regarding delusion," and Sanders's testimony "regarding prior incidents" did not provide substantial evidence of imperfect self-defense. A trial court is under no duty to give an instruction unsupported by substantial evidence. (Cf. *People v. Tufunga* (1999) 21 Cal.4th 935, 944.) The trial court did not err by refusing to instruct on imperfect self-defense.

---

[6] Although appellant cites appellant's statement to the detectives as evidence supporting the giving of an imperfect self-defense instruction, appellant cites no authority for the proposition that we should consider excluded evidence or, as to appellant's statement in particular, properly excluded evidence, when determining whether substantial evidence supported the giving of an imperfect self-defense instruction. We decline to do so.

24

Finally, even if the trial court erred by refusing to instruct on imperfect self-defense, it does not follow that we must reverse the judgment. The court would have been able to instruct on imperfect self-defense only if it was an issue at trial. If imperfect self-defense had been an issue at trial, the People would have been able to present potent evidence from appellant's statements to the detectives that she committed intentional murder for revenge. No prejudicial instructional error occurred. (Cf. *People v. Breverman* (1998) 19 Cal.4th 142, 178; *Watson, supra*, 46 Cal.2d at p. 836.)[7]

3. *The Trial Court Correctly Applied the M'Naghten Test During the Sanity Trial and There Was Sufficient Evidence of Appellant's Sanity.*

    a. *Pertinent Facts.*

The pertinent facts are discussed below; we italicize some of particular importance to our later analysis. After the parties rested at the court trial on the issue of appellant's sanity, the court, discussing areas on which the parties might focus their arguments, indicated it had no doubt appellant suffered from a mental disease at the time of the crime, and the issue was whether appellant "did not understand that her act was *morally or* legally wrong." (Italics added.) The trial court indicated the *stronger* argument for appellant was she did not understand her act was *morally* wrong. The court stated, ". . . I think the court *puts a lot of importance* in whether the defendant believed this was a threat, and this threat was immediate. [¶] In other words*, I am looking as to whether this was a revenge, or was it self-defense. . . .* So anyway*, I am not saying don't argue anything else. Argue anything you choose, but that is where the court has been left with some sort of question*." (Italics added.) Appellant argued she was insane because her mental illness caused her to believe her act was morally justified. Appellant did not expressly argue appellant believed she was legally justified or did not know that what she did was legally wrong.

---

**7**    In light of the above, we reject appellant's claim that cumulative evidentiary and instructional error occurred during the guilt trial.

After argument, the court found appellant had "a mental disease at the time of the incident," later found she "[understood] the nature and the quality of the act" and, still later, found she "understood that what she did was legally wrong."

The court then stated, "That leaves now whether she believed that it was *morally* wrong. And that is where the court looks to as the *Skinner* case[8] did, whether the acts were as a form of in her mind self-defense, or was it an act of revenge. [¶] The court does not look to – just like Dr. Sharma, did not look to only one issue or one statement but *looks at the totality of the circumstances to determine if this was an act of revenge or was this an act to prevent further harm or death.*" (Italics added.) (This is the statement challenged by appellant.)

After discussing the evidence, including, in particular, appellant's statement to the detectives, the court stated, "it's . . . clear to the court that she believes that the act of stabbing someone is *wrong*." (Italics added.) The following later occurred: "[The Court]: So based on the evidence that is presented before this court, the court finds that the defendant was sane at the time that the defense has not met its burden of proving to the standard of more likely than not. And [appellant] did not understand that the act was morally wrong. [*Sic*.] [¶] [The Prosecutor]: So what was the finding? [¶] The Court: The court finds that she was sane at the time. [¶] [The Prosecutor]: And that she did understand. [¶] The Court: And that she did understand that her act was *wrong* during the time she committed the act and legally wrong *as well*." (Italics added.)

b. *Analysis.*

Appellant, making various arguments (which she did not make to the trial court), claims the trial court erroneously applied the *M'Naghten* test during the sanity trial. We reject her claim. "Under the *M'Naghten*[9] test, insanity is established if the defendant was incapable of knowing or understanding the nature and quality of the criminal act, or

---

[8]     *People v. Skinner* (1986) 185 Cal.App.3d 1050 (*Skinner*).

[9]     *M'Naghten's Case* (1843) 10 Clark & Fin. 200, 210 [8 Eng.Rep. 718, 722].

26

of distinguishing right from wrong. ([Pen. Code,] § 25, subd. (b); [citation].)" (*People v. Mills* (2012) 55 Cal.4th 663, 671.)

"In [*People v. Coddington* (2000) 23 Cal.4th 529 (*Coddington*)], the court approved the following instruction, based on Penal Code section 25, subdivision (b), and *People v. Skinner* [(1985)] 39 Cal.3d 765: ' " . . . [¶] A person is legally insane when, by reason of mental disease or mental defect he was incapable of knowing or understanding the nature and quality of his act *or* incapable of distinguishing right from wrong at the time of the commission of the offense. The word 'wrong' as used in this instruction is not limited to legal wrong, *but properly encompasses moral wrong as well*. Thus, the defendant who is incapable of distinguishing what is morally right from what is morally wrong is insane, even though he may understand the act is unlawful." ' (*Coddington*, *supra*, at p. 608.)" (*People v. Torres* (2005) 127 Cal.App.4th 1391, 1401-1402 (*Torres*); italics added.) Phrased differently, on the issue of wrong, appellant did not have to prove that she did not know that what she did was morally wrong *and* that she did not know that what she did was legally wrong; she only had to prove one of the two.

Appellant first argues the trial court erroneously believed she "[had] to prove she believed her actions were legally justified self-defense in order to claim insanity." We disagree. The trial court never expressly stated such proof was required. Moreover, proof appellant believed her actions were legally justified self-defense would have been proof appellant did not know that what she did was legally wrong. If, as appellant suggests, the trial court believed appellant *had* to prove that she did not know that what she did was legally wrong, the trial court, having found that appellant understood that what she did was legally wrong, should have ended its inquiry there. In fact, however, after making that finding, the court then stated, "That leaves now whether she believed that it was *morally* wrong," (italics added) a gratuitous inquiry if the trial court had believed appellant was required to prove she believed her actions were legally justified self-defense in order to claim insanity. In light of this and the entirety of the court's comments, appellant's argument is without merit.

27

Second, appellant argues the trial court's statement that the court "looks at the totality of the circumstances to determine if this was an act of revenge or was this an act to prevent further harm or death" (1) took out of context certain language in *Skinner*, (2) indicated the court believed appellant "*had* to prove that she believed she acted in self-defense in order to claim legal insanity," (italics added) and (3) thereby erroneously interpreted the *M'Naghten* test to require appellant to prove she did not know that what she did was legally wrong. We disagree.

*Skinner* stated, "It has been the law at least since *M'Naghten's* case that whether a defendant is responsible for a killing which occurs under an insane delusion depends on the nature of the delusion. [Citation.] For example, if the delusion is that another is about to take the defendant's life, and the defendant acts in self-defense, an insanity defense will prevail. But if the delusion is that the victim slandered the defendant, and the latter kills for revenge, it will not. (*Ibid*.) 'The delusion first suggested . . . results in an inability to appreciate that the act is wrong. . . . The second delusion, without more, does not suggest that the defendant believes his act is lawful or morally justified.' (*Ibid*.)" (*Skinner, supra*, 185 Cal.App.3d at p. 1060.)

The challenged comment of the court that it "looks at the totality of the circumstances to determine if this was an act of revenge or was this an act to prevent further harm or death" did not occur in a vacuum. We believe the challenged comment, fairly read in the context of the entirety of the court's comments (including those italicized in our recitation of the pertinent facts), indicated the court had concluded from *Skinner* that whether appellant acted in revenge or to prevent further harm or death was a factor of "importance" for the court to consider as it determined whether appellant had proven she did not know her act was morally wrong. The challenged comment did not take language in *Skinner* out of context. Whether appellant acted in revenge or to prevent further harm or death was a factor relevant to whether appellant knew that what she did was *morally* wrong, whether or not that factor was also relevant to whether she knew that what she did was legally wrong.

28

The trial court is presumed to have known and followed the law (cf. *People v. Mosley* (1997) 53 Cal.App.4th 489, 496; Evid. Code, § 664), including, here, the *M'Naghten* test as it is reflected in California law pertaining to insanity. Nothing the trial court said indicated it did not understand that, on the issue of wrong, appellant could have proven insanity based only on a mental disease resulting in appellant's lack of knowledge that what she did was morally wrong. The trial court did not err as argued by appellant.

Even if the trial court erred as argued by appellant, the evidence at the sanity trial included the People's evidence at the guilt trial, plus appellant's statement to the detectives, and the defense evidence presented at the sanity trial. We have discussed that evidence in detail in this opinion and believe there was ample evidence appellant murdered Ward out of revenge and that appellant knew that what appellant did was morally and legally wrong. The alleged error was not prejudicial. (*Watson, supra*, 46 Cal.2d at p. 836.)

Appellant makes the related claim that there was insufficient evidence of appellant's sanity. We reject the claim. We note the issue in this case is not whether appellant was *colloquially* insane. Nor is there any real issue appellant was a paranoid schizophrenic. Appellant's burden at the sanity trial was to prove by a preponderance of the evidence that appellant was *legally* insane (*People v. Ferris* (2005) 130 Cal.App.4th 773, 776, 780), a burden requiring more than mere proof appellant was colloquially insane or a paranoid schizophrenic.

At the sanity trial, the trial court, in the discharge of its function as the trier of fact, was entitled to evaluate the credibility of witnesses, weigh evidence, and accept all or part of the People's evidence and/or the defense evidence on the issue of whether appellant was legally insane. Having done that, the trial court found appellant was legally sane, which implied a finding appellant failed to meet her burden to prove she was legally insane.

The issue here is not whether appellant met the above burden at the sanity trial. The issue here is whether the trial court *reasonably could have concluded* appellant failed to meet her burden. Phrased differently, we cannot overturn the trial court's finding that

29

appellant failed to prove she was legally insane unless we "find as a matter of law that the court *could not reasonably reject* the evidence of [legal] insanity [citations]." (*Skinner, supra*, 185 Cal.App.3d at p. 1059, italics added.)

As mentioned, the parties stipulated the court could consider the evidence presented at the guilt trial as evidence presented at the sanity trial. The trial court during the sanity trial was not obligated to believe the defense evidence, even expert evidence, that appellant was legally insane. The People's evidence during the guilt trial, which was evidence presented at the sanity trial, was simply that appellant committed second degree murder, i.e., she committed a homicide with malice aforethought.

The trial court reasonably could have relied on the People's evidence of malice aforethought, and reasonably could have rejected any evidence of legal insanity, to conclude appellant failed to meet her burden at the sanity trial. The People's evidence of malice aforethought included, but was not limited to, evidence of appellant's actions while she was inside the store purchasing the murder weapon, as well as various inculpating statements (including delusional statements indicating revenge was the motive for the killing) that she made to the detectives.[10] We note that even Sharma conceded in his report that appellant knew the nature and quality of her act based upon her going to the store to shop for a knife, preparing the knife, then stabbing Ward.

The trial court reasonably could have relied on the People's evidence and Sharma's concession to conclude appellant failed to prove she did not know the nature or quality of her act, failed to prove she did not know that what she did was morally wrong, and failed to prove she did not know that what she did was legally wrong, as those concepts are more fully explicated in *Mills*, *Coddington*, and *Torres*. The fact that, if the trial court had found appellant was legally insane, there might have been evidence to support that finding, is irrelevant; the trial court made no such finding.

---

[10]     As indicated in a May 30, 2013 order, this court has listened to the CD reflecting appellant's statements to the detectives.

30

## *DISPOSITION*

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.

CROSKEY, J.